**United States District Court**
For the Northern District of California

**E-FILED on** 2/22/08

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| CYGNUS TELECOMMUNICATIONS TECHNOLOGY, LLC, <br><br> Plaintiff, <br><br> v. <br><br> WORLDPORT COMMUNICATIONS, INC., INTERCONTINENTAL EXCHANGE, INC., TELENATIONAL CORP., MILTEL, and WORLDPORT/ICX, INC., <br><br> Defendants. | No. C-02-00144 RMW <br><br> **[Re Docket No. 22]** <br><br> ORDER DENYING PLAINTIFF'S MOTION FOR PAYMENT OF ROYALTIES |
| AND | |
| CYGNUS TELECOMMUNICATIONS TECHNOLOGY, LLC, <br><br> Plaintiff, <br><br> v. <br><br> DIAL-THRU INTERNATIONAL, <br><br> Defendant. | No. C-02-00142 RMW <br><br> **[Re Docket No. 281]** <br><br> ORDER DENYING PLAINTIFF'S MOTION FOR PAYMENT OF ROYALTIES |

Plaintiff Cygnus Telecommunications Technology, LLC ("Cygnus") has filed a motion for payment of royalties in an unspecified amount. It asks the court to compel Telenational Corp. ("Telenational") to pay royalties for use of international call-back by Rapid Link Inc., formerly

known as Dial-Thru International ("Rapid Link") based upon a July 8, 2002 consent judgment between Cygnus and Worldport Communication, Inc. ("Worldport"), InterContinental Exchange, Inc. ("ICX") and Worldport/ICX, Inc. Cygnus also asks the court to issue an order to show cause why Telenational, Rapid Link, Inc. (formerly Dial-Thru International), Apex, Inc. ("Apex"), and Christopher Canfield are not in contempt of court for violating that consent judgment.

The court has read the moving and responding papers and considered the arguments of counsel. For the reasons set forth below, Cygnus's motion for payment of royalties is denied and the court declines to issue an order to show cause.

## I. BACKGROUND

### A. Factual Background

Cygnus's theory that Telenational must pay for Rapid Link's use of international call-back is tied to an individual named Chris Canfield. Although Canfield was never named as a defendant in either of the two above-captioned cases, Cygnus contends that Telenational, which was acquired by Rapid Link, is in privity with Canfield and companies formerly held by Canfield. Cygnus asserts that Rapid Link, by virtue of having acquired Telenational, is now bound by licenses and consent judgments entered by certain companies associated with Canfield.

As best the court can tell, the chronology of the events at issue for purposes of Cygnus's motion follows.

### 1. ICX

From 1993 to 1996, Canfield worked for a company called MTC Telemanagement Corp. ("MTC"). Wyatt Decl. ¶ 4; Mot. at 2-3.[1] In 1996, four former employees of MTC, including Canfield, started InterContinental Exchange ("ICX"). Canfield Decl. ¶ 2; Wyatt Decl ¶ 4. Canfield was a 25% owner of ICX. Canfield Decl. ¶ 2.

---

[1] MTC allegedly "provided international call-back services using the invention of Dr. Alleman for many years before the first [of the patents-in-suit] issued" (a curious statement). Wyatt Decl. ¶ 3. Cygnus did not serve MTC because it had gone out of business at the time Cygnus began initiating litigation against international call-back providers. *Id.*

### 2. WorldPort/ICX

WorldPort Communications acquired Telenational on May 20, 1997. Canfield Decl. ¶ 3. Telenational subsequently became Telenational Communications, Inc. *Id.* In April 1998, ICX was sold to WorldPort and became "WorldPort/ICX." Canfield Decl. ¶ 2; Wyatt Decl ¶ 4. Canfield became vice-president of WorldPort and integrated the operations of ICX into WorldPort's Telenational operation in Omaha, winding down ICX's operations. Canfield Decl. ¶ 4.

### 3. Cygnus Patents Issue and Cygnus Initiates Litigation

Patent No. 5,883,964 ("the '964 patent") issued on March 16, 1999. Wyatt Decl. ¶ 2. In the same year, Cygnus initiated suit in this district against several defendants for infringement of the '964 patent, including ICX and WorldPort, Case No. 99-20411. *Id.* On September 24, 1999, Cygnus sued MTC along with a number of other defendants, Case No. 99-21151, but was unable to effect service on MTC as it had gone out of business. *Id.* ¶ 3. In 2001, Cygnus sued WorldPort in Chicago for infringement of both the '964 patent and the subsequently-issued Patent No. 6,035,027 ("the '027 patent"). *Id.* ¶ 6. The case was transferred to the Northern District of California in 2002 and became the instant case, Case No. 02-00144. Cygnus added defendant Intercontinental Exchange, Inc. ("ICX") as a party to Case No. 02-00144. Canfield filed an expert declaration as part of WorldPort's defense against Cygnus's claims. Canfield Decl. ¶ 5.[2] As set forth in further detail below, Case No. 02-00144 was closed in 2002 after several of the defendants entered into a Consent Judgment with Cygnus.

In 2002, Cygnus sued several defendants including Dial-Thru (now Rapid Link) which at the time was a separate company. As set forth in further detail below, this case, Case No. 02-00142, was closed in May 2007 after this court entered a judgment that the Cygnus patents-in-suit are invalid under the on-sale bar.

---

[2] Interestingly, Canfield has also, in the past, voluntarily assisted Cygnus in litigating some of its patent disputes. Wyatt Decl. ¶ 10.

ORDER DENYING PLAINTIFF'S MOTION FOR PAYMENT OF ROYALTIES- No. C-02-00144 RMW
AEL/MAG                                    3

#### 4. Apex Acquires Telenational

In October 2001, WorldPort exited the international call-back business. Wyatt Decl. ¶ 8. Around the time WorldPort left the international call-back business, Canfield set up Apex Inc., a corporation in which he is 70% owner. Wyatt Decl. ¶ 8. Apex acquired all the stock of Telenational from WorldPort on October 31, 2001, at which time Canfield claims that his tenure and financial interest in WorldPort ended. Canfield Decl. ¶¶ 6-7. Canfield has been President of Telenational since approximately October 31, 2001. Canfield Decl. ¶ 1.

#### 5. Consent Judgment

On July 8, 2002, approximately eight months after Apex had acquired Telenational from WorldPort on October 31, 2001, defendants WorldPort, ICX, and WorldPort/ICX consented to the entry of a judgment with Cygnus wherein the settling defendants agreed that they did "not contest that the patents are valid and enforceable." *Id.* ¶ 2.; Wyatt Decl., Ex. 2 ("Consent Judgment"). At the time of the Consent Judgment, Apex and Telenational claim that they did not have any interest in WorldPort, ICX or WorldPort/ICX. Canfield Decl. ¶¶ 6-7. The text of the Consent Judgment reads as follows:

> The parties having amicably resolved their differences, it is hereby stipulated by and between plaintiff Cygnus Telecommunications, Inc.; Intercontinental Exchange, Inc.; and WorldPort/ICX, Inc. (collectively the "Settling Defendants"), that judgment be entered against Settling Defendants terminating this litigation and all claims therein against them.
>
> It is further stipulated that the Settling Defendants do not contest infringement of United States Patent 5,883,964 and United States Patent 6,035,027 (the "Patents") and do not contest that the Patents are valid and enforceable.
>
> It is further stipulated that this Court shall retain jurisdiction of this matter for the purpose of enforcing the terms of the Settlement Agreement between the parties.

The court closed Case No. 02-00144 as to all defendants, including Telenational, following entry of the Consent Judgment.

#### 6. License Agreement Between Cygnus and Apex

On July 21, 2002, Cygnus and Apex (represented by Canfield) signed a license agreement. Wyatt Decl., Ex. 3, "License Agreement." Canfield agreed to pay a reasonable royalty going forward and for the period in 2001 and 2002 when Telenational allegedly used the invention without

Cygnus's consent. Wyatt Decl. ¶ 8. The License Agreement defined "Licensee" as including both Apex and Telenational, acknowledging that "Telenational was, before October 25, 2001, owned by Worldport Communications, Inc., another defendant in Cygnus litigation with whom a settlement agreement has been reached." License Agreement ¶ 1.D. It also provided that APEX/Telenational would pay past royalties for the period between October 25, 2001 and July 31, 2002, *id.* ¶ 3 and future royalties based on a percentage of gross monthly revenues, *id.* ¶ 4. The parties do not dispute that Apex paid the past royalties as specified in the License Agreement or that it timely paid ongoing royalties due under the License Agreement from July 2002 to March 2007. Wyatt Decl. ¶ 9; Canfield Decl ¶ 11.

### 7. **Telenational Is Sold to Dial-Thru**

On February 22, 2006, Cygnus received notification that Telenational was to be sold to Dial-Thru International, which became Rapid Link. Supp. Decl. Perry Wyatt ("Wyatt Supp. Decl."), Ex. 6 (February 22, 2006 letter informing Cygnus that Telenational had signed a binding letter of intent to be acquired by Rapid Link). In May 2006, Apex sold all stock in Telenational to Rapid Link. Canfield Decl. ¶ 12; Wyatt Decl. ¶ 11. On May 5, 2006, Canfield became Chief Financial Officer of Rapid Link; on November 3, 2006, he became President. Canfield Decl. ¶ 1. Telenational remains a wholly-owned subsidiary of Rapid Link, the parent corporation. *Id.* at ¶ 12.

After Cygnus learned about the proposed sale of Telenational to Rapid Link, Cygnus informed Canfield that any transfer of rights without Cygnus's consent would automatically terminate Telenational's rights under the license agreement. Wyatt Decl. ¶ 12. In the parties' communications about the sale of Telenational stock to Rapid Link, Canfield explained that the transfer was merely a way for Telenational, a private company, to acquire the publicly-traded Rapid Link, that Telenational was not transferring its rights, and that royalties would be paid on the total call-back business. *Id.* ¶ 13. Canfield had Rapid Link pay cash to Apex in the amount of $1.5 million over 12 months, and transfer a total of 19,175,000 shares of Rapid Link stock over 12 months to Apex, in return for all the stock of Telenational. Plaintiff's Reply to Opp'n at 2.

Dial-Thru moved its operations from Los Angeles to Omaha, where Telenational was operating, and the two companies consolidated their operations. Reply at 7.

### 8. Cygnus Terminates the Apex License

With the transfer in 2006, Canfield offered to pay Cygnus royalties going forward from the date of the Telenational/Rapid Link transaction for the Rapid Link portion of the international call-back business if Cygnus agreed to forgive past due royalties owed by Dial-Thru and Rapid Link from 1999 to 2006. Cygnus declined the offer. Wyatt Decl. ¶ 14; Mot. at 4-5. Cygnus gave notice to Apex of automatic termination of the license agreement on March 2, 2007, because, Cygnus argues, Telenational had not paid royalties for Rapid Link's call-back traffic, and neither Dial-Thru nor Rapid Link had paid licensing fees to Cygnus since 1999 for use of the invention. Wyatt Decl. ¶ 14-15, Ex. 4; Canfield Decl. ¶ 12, Ex. C (notice of termination stating "notice is hereby given that the [License Agreement dated July 21, 2002 between Cygnus and Apex] was automatically terminated when Apex transferred all of the stock of Telenational Corp. to Rapid Link, Inc. in 2006."). On March 21, 2007, Canfield sent an email to Cygnus stating that he and his lawyer "do not feel there is any breach in the license agreement, thus we will continue to honor it." Wyatt Supp. Decl., Ex. 4. The parties do not dispute that Apex/Telenational paid royalties under the July 21, 2002 License Agreement between Cygnus and Apex until March 2007. Wyatt Decl. ¶ 9; Canfield Decl. ¶ 11.

### 9. The '964 and '027 Patents are Invalidated

On March 29, 2007, in a multi-district litigation involving the '964 and '027 patents, this court held the '964 and '027 patents to be invalid under the on-sale bar of 35 U.S.C. § 102(b) because Cygnus offered the invention for sale commercially more than a year before the filing date of the patent applications. *In re Cygnus Telecommunications Technology, LLC, Patent Litigation*, 481 F. Supp. 2d 1029, 1052 (N.D. Cal. 2007) (Whyte, J.).[3] As a result of its order invalidating the '964 and '027 patents, the court entered judgments on March 30, 2007 in the affiliated multi-district litigation

---

[3] Dial-Thru, which became Rapid Link, was involved in the March 29, 2007 ruling, and the court, in addition to making its invalidity determination, also denied Cygnus's motion for summary judgment that Dial-Thru infringed the patents-in-suit. *Id.*

ORDER DENYING PLAINTIFF'S MOTION FOR PAYMENT OF ROYALTIES- No. C-02-00144 RMW
AEL/MAG        6

cases. These judgments included one judgment favor of defendant Dial-Thru International (now Rapid Link) and against Cygnus in *Cygnus v. Dial-Thru*, Case No. 02-00142. Canfield Decl., Ex. D.

### 10. Telenational/Rapid Link Ceases to Make Royalty Payments

On March 29, 2007, after the March 2, 2007 notice of termination by Cygnus but before any further royalty payments were due to be paid pursuant to the License Agreement, this court held the Cygnus patents to be invalid and filed a judgment on March 30, 2007 in favor of defendant Dial-Thru International (now Rapid Link) and against Cygnus as part of a multi-district litigation. Canfield Decl., Ex. D. Because Cygnus had terminated the agreement and the court had ruled that the patents were invalid, Apex/Telenational stopped making payments to Cygnus after the March 2007 order and judgment. Canfield Decl. ¶ 14. Cygnus contends that this failure to pay royalties constitutes a breach of the July 21, 2001 License Agreement and asks the court for an order to show cause why Telenational, Apex, Canfield and Rapid Link should not be held in contempt for violating the Consent Judgment.

### B. The Instant Motion

On June 6, 2007, Cygnus filed a motion for payment of royalties against defendants ICX, Telenational Corp., Miltel, and WorldPort/ICX, Inc. in Case No. 02-00144 and Dial-Thru in Case No. 02-00142 to compel Telenational to pay royalties for Rapid Link's use of international call-back. Cygnus contends that Telenational should now be required to pay for Rapid Link's past and ongoing use of the inventions claimed in the '964 and '027 patents because Telenational has acquired Rapid Link. Cygnus has filed its motion in both above-captioned cases because (1) Telenational was once part of WorldPort and (2) Dial-Thru became Rapid Link.

## II. ANALYSIS

Cygnus argues that based on the License Agreement and the Consent Judgment, Telenational is required to pay royalties for both its own use and for Dial-Thru/Rapid Link's use of international call-back. Cygnus also contends that use of the patented inventions coupled with the failure to pay royalties is a breach of the license agreement and contempt of court, because (1) WorldPort stipulated that the patents were valid and infringed as part of the July 8, 2002 Consent Judgment and

(2) Canfield, Apex, Telenational, and ICX were in privity with WorldPort at the time. Mot. at 4-5. Cygnus argues that the WorldPort consent judgment is *res judicata*. *Id.* at 4. While Cygnus recognizes that the March 30, 2007 judgment entered in the Dial-Thru case will bar further litigation of the patents if the judgments are upheld on appeal, it contends that those judgments are not final, and that the patents are valid until the judgments have been appealed and there is a final judgment of invalidity. *Id.*

Telenational opposes this motion, stating that while it was a party to the License Agreement, its obligation to pay royalties under the License Agreement was terminated by this court's ruling that the Cygnus patents are invalid. It further argues that Cygnus is estopped to argue that the patents in-suit are valid or that any of the defendants are obligated to pay royalties for their use of invalid patents. Opp'n at 5-6. Telenational also contends that neither it nor Canfield were parties to the July 8, 2002 Consent Judgment and therefore neither they nor Apex or Rapid Link are bound by it. *Id.* at 8.

**A.     Res Judicata**

Under *res judicata*, a final judgment on the merits of an action precludes the parties or their privies from relitigating the same claim or cause of action that was or could have been raised in that action. *Kremer v. Chemical Const. Corp.*, 456 U.S. 461, 467 (1982); *see also Comm'r v. Sunnen*, 333 U.S. 591, 597 (1948) (final judgment "puts an end to the cause of action, which cannot again be brought into litigation between the parties upon any ground whatever."). The doctrine of *res judicata* requires that the party to be affected, or some other with whom he is in privity, has litigated or had an opportunity to litigate the same matter in a former action in a court of competent jurisdiction. A state cannot enforce a judgment against one without a hearing or opportunity to be heard, or against one who is neither a party nor in privity with a party in the suit. *Postal Telegraph Cable Co. v. City of Newport, Ky.*, 247 U.S. 464, 475 (1918). *Res judicata* "relieve[s] parties of the cost and vexation of multiple lawsuits, conserve[s] judicial resources, and, by preventing inconsistent decisions, encourage[s] reliance on adjudication." *Allen v. McCurry*, 449 U.S. 90, 94 (1980). If *res judicata* applies to the specific facts of a case, disobedience or resistance to a consent

decree may be punished as contempt of court. *See United States v. Armour & Co.*, 402 U.S. 673 (1971).

### 1. Effect of the Consent Judgment on Signatories

After a consent decree is entered in settlement of a patent infringement action, the doctrine of *res judicata* may still operate to bind the parties. *See Foster v. Hallco Mfg. Co.*, 947 F. 2d 469, 480-83 (Fed. Cir. 1991) (ordinarily claim preclusion is appropriate in relation to a consent judgment)*; Siebring v. Hansen*, 346 F.2d 474, 477 (8th Cir. 1965). Although a consent decree is negotiated by the parties, it is a judicial act, and is as binding under *res judicata* as a trial on the merits. *Interdynamics, Inc. v. Firma Wolf*, 653 F.2d 93, 97 (3d Cir. 1981); *see also Schlegel Mfg. Co. v. USM Corp.*, 525 F.2d 775, 780 (6th Cir. 1975) ("Even though the degree of judicial involvement is different between a consent decree and a litigated result, we are not prepared to find that judicial involvement in a consent decree is so inconsequential as to justify different treatment."); *Crane Boom Life Guard Co. v. Saf-T-Boom Corp.*, 362 F.2d 317, 321–322 (8th Cir. 1966) ("a valid judgment or decree in a patent infringement action entered by agreement or consent, operates as *res judicata* to the same extent as a judgment or decree rendered after a contest."). "[J]udicial decrees disposing of issues in active litigation cannot be treated as idle ceremonies without denigrating the judicial process." *Wallace Clark & Co. v. Acheson Industries, Inc.*, 532 F.2d 846, 849 (2d Cir. 1976).

A consent judgment that states that the patent is both valid and infringed precludes further litigation of validity. *Id.* While in some cases this policy may result in the survival of invalid patents, the agreements are arrived at in settlement of adversary litigation with determinations of both infringement and validity and "with the discovery machinery of the courts available to the parties, and are subject to court scrutiny, in contrast to . . . purely private license agreements." *Id.*

Patent cases present a unique problem because a defendant may become dissatisfied with a consent judgment that states that the patents-in-suit are valid and infringed and licenses him to practice the invention. 18A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 4443 (2d ed. 2007). The defendant may later attempt to avoid the judgment by arguing

that because a private license agreement cannot estop the licensee from contesting the patent's validity, a private settlement and consent decree also cannot estop the defendant. *Id.*

Generally, preserving settlement agreements through preclusion encourages vigorous defense and settlement of patent litigation. *Flex-Foot, Inc. v. CRP, Inc.*, 238 F.3d 1362, 1367-70 (Fed. Cir. 2001); *American Equipment Corp. v. Wikomi Mfg. Co.*, 630 F.2d 544 (7th Cir. 1980). Because a consent judgment has greater effect, defendants will be less prone to settle for an unfair result and other parties will still remain free to challenge the patent. *Id.* Also, due to the high cost of patent litigation, the public has a strong interest in settlement, and parties will be more willing to agree on a settlement if they know the court will uphold the terms of their agreement. *Flex-Foot, Inc.*, 238 F.3d at 1367-1370. Absent a strong overriding policy, the interest in finality of consent judgments outweighs the interest in limiting patent monopolies described in *Lear*. *Vulcan v. Fordees Corp.*, 658 F.2d 1106, 1111 (6th Cir. 1981); *see also Lear,* 395 U.S. at 670.

Because they are parties to the July 8, 2002 Consent Judgment, *res judicata* would apply to WorldPort, ICX, WorldPort/ICX and Cygnus with regard to their stipulation not to contest the validity of the patents. However, it is notable that the Consent Judgment entered by this court *does not* state that the court has found the Cygnus patents to be valid. The Consent Judgment states only that "Settling Defendants do not contest infringement of United States Patent 5,883,964 and United States Patent 6,035,027 (the 'Patents') and do not contest that the Patents are valid and enforceable."

Assuming the Consent Judgment somehow precludes the parties thereto from further litigating the validity of the Cygnus patents, Telenational, Apex, Canfield and Rapid Link were not parties to the Consent Judgment. WorldPort, WorldPort/ICX and ICX exited the international call-back business in 2001, and Cygnus does not contend that the WorldPort entities owe any further royalties to Cygnus.

## 2. Consent Judgment's Effect on Non-Parties

Cygnus argues that both Telenational and Canfield are of WorldPort and are thus bound by the Consent Judgment. Cygnus contends that Canfield and Telenational were in privity with WorldPort when WorldPort entered into the Consent Judgment. Reply at 3. Cygnus also contends that Canfield and Apex were in privity with WorldPort because the July 21, 2002 License Agreement between Apex and Cygnus includes Telenational as part of the definition of "Licensee"[4] and because Telenational, Apex, Apex Acquisitions, and Rapid Link are "alter egos" of WorldPort. *Id.* at 2-3.

Parties and "all persons who are represented by the parties and claim under them, or in privity with them" are bound by a judgment. *Litchfield v. Crane*, 123 U.S. 549, 551 (1887). The term "privity" means a "mutual or successive relationship to the same rights of property," *id.*, so a judgment regarding a particular property interest has "preclusive effects upon a person who succeeds to the interest of a party to the same extent as upon the party himself."[5] *See Int'l Nutrition Co. v. Horphag Research, Ltd.,* 220 F.3d 1325, 1329 (Fed. Cir. 2000).

A corporation cannot free itself from liability for its acts by distributing its assets. *Pierce v. United States*, 255 U.S. 398, 402 (1921). Thus, if a corporation distributes its property among its stockholders, adjudicated claims may be satisfied out of stockholders' assets. *Id.* However, parties

---

[4] The License Agreement between Cygnus and Apex provides:
Licensee means Apex, Inc., and all of its present subsidiaries, agents, sub-agents, and representatives, including without limitation its wholly owned subsidiary Telenational Communications, Inc. Telenational was, before October 25, 2001, owned by WorldPort Communications, Inc., another defendant in Cygnus litigation with whom a settlement agreement has been reached . . . This License extends also to Militel, an agent for Call-Back Services that uses Licensee's facilities and network.

[5] Under California law, *Gee v. Tenneco, Inc.*, 615 F.2d 857, 863 (9th Cir. 1980), and under traditional rules of successor liability, asset purchasers are not liable as successors unless one of the following four exceptions applies:

(1) The purchasing corporation expressly or impliedly agrees to assume the liability; (2) The transaction amounts to a "de-facto" consolidation or merger; (3) The purchasing corporation is merely a continuation of the selling corporation; or (4) The transaction was fraudulently entered into in order to escape liability.

*Louisiana-Pacific Corp. v. Asarco, Inc.,* 909 F.2d 1260, 1263-64 (9th Cir. 1990) *overruled on other grounds by Atchison, Topeka and Santa Fe Ry. Co. v. Brown & Bryant, Inc.,* 159 F.3d 358 (9th Cir. 1997).

are in privity only with respect to an adjudication of rights in the transferred property, not with respect to an adjudication of rights in other property never transferred between the two. *Int'l Nutrition*, 220 F.3d at 1329, 1327 (trademark company could not limit rights of transferee that were unrelated to the transferred property; *res judicata* did not apply to non-parties to a default judgment because the parties were not privies to the action); *Munoz v. County of Imperial*, 667 F.2d 811, 816 (9th Cir. 1982) (non-parties were not in privity with a party to litigation because "[t]he right which the [third parties] seek to litigate is not one which they obtained through contractual relations with [a party to the previous litigation]. It is a completely independent right[.]"). In addition, the *res judicata* effect of a property transfer applies only if the property is transferred either during or after litigation that leads to an adverse ruling with respect to that property. *Int'l Nutrition*, 220 F.3d at 1331. The grantor can transfer no better right or title than he has himself, and nothing which the grantor can do or suffer after he has conveyed the title can affect rights previously vested in the grantee, for there no longer is privity between them. *Postal Tel. Cable Co.*, 247 U.S. at 474-75. Therefore, a judgment against a prior owner is only held conclusive against his successor in interest to the extent that the estoppel runs with the property. *Id.* (res judicata was inadequate support for requiring suit against original company requiring payment of license taxes to apply to successor company because suit against original company was brought two years after original company had conveyed its property to a successor company).

Here, the evidence does not indisputably show that Telenational or Canfield was in privity with WorldPort at the time that WorldPort, ICX and WorldPort/ICX entered into the Consent Judgment with Cygnus on July 8, 2002. Apex acquired all stock of Telenational from WorldPort on October 31, 2001. Canfield Decl. ¶¶ 6-7. And although the ICX operations had been merged into Telenational, WorldPort apparently no longer owned any interest in Telenational as of July 8, 2002. This state of affairs is acknowledged in the July 21, 2002 License Agreement between Cygnus and Apex as part of the definition of "Licensee." License Agreement ¶ 1.D ("Licensee means Apex, Inc. . . . [including its] wholly owned subsidiary Telenational Communications, Inc. Telenational was, before October 25, 2001, owned by Worldport Communications, Inc., another defendant in Cygnus litigation with whom a settlement agreement has been reached.").

Canfield further states that "there was no involvement whatsoever by Telenational, Apex or [himself] in th[e] July 8, 2002 settlement," Canfield Decl. ¶ 7, and, indeed, two of the defendants from Case No. 02-00144 are notably absent from the Consent Judgment: Telenational and Miltel. These defendants are expressly included in the Licensee definition in the June 21, 2002 License Agreement, which also sets forth that Telenational has not been owned by WorldPort since October 25, 2001. It thus seems clear from both the Consent Judgment and the License Agreement that neither Apex nor Canfield was in privity with WorldPort when Cygnus and the WorldPort entities entered into the Consent Judgment on July 8, 2002.

Because Cygnus fails to show privity between Telenational or Canfield and WorldPort at the time the July 8, 2002 Consent Judgment was entered into, for Rapid Link to be required to pay royalties based on the Consent Judgment, the court would have to find that Rapid Link obtained its rights to use the patented technology directly or indirectly from WorldPort and that it did so at the time of or after entry of the Consent Judgment. *Cf. Int'l Nutrition Co.*, 220 F.3d at 1330. Cygnus has presented no evidence that this is the case. There is no dispute Cygnus has alleged that Rapid Link (as Dial-Thru) has been using international call-back since 1999. Moreover, Cygnus does not show that Rapid Link obtained its rights to use the technology directly or indirectly from WorldPort. Rapid Link cannot be bound by an adjudication of rights in property never transferred between itself and WorldPort.

Cygnus's final argument is that Telenational, Apex, Apex Acquisitions, and Rapid Link are "alter egos" of WorldPort fails for lack of evidence. Although there is potentially some relationship between the companies who are parties to the Consent Judgment and License Agreement, there are substantial factual questions as to whether these companies are alter egos of WorldPort. Telenational and Apex claim and have presented some evidence that they had no interest in WorldPort since before the WorldPort companies entered into the Consent Judgment; Cygnus has not sufficiently demonstrated an alter ego or privity relationship between any of the parties.

### B. License Agreement

The court next addresses whether Telenational appropriately ceased payments under the License Agreement. In *Lear v. Adkins*, the Supreme Court held that a licensee is not estopped from

attacking the validity of a patent, and that, regardless of the contract's provisions, a licensee is entitled to avoid payment of all royalties accruing after the patent issued if the licensee or a third party can prove the invalidity of the patent. *Lear, Inc. v. Adkins*, 395 U.S. 653, 667, 670 (1969). Recently, the Supreme Court held in *MedImmune v. Genentech* that a patent licensee who does not repudiate the license may still challenge the patent's validity. *MedImmune, Inc. v. Genentech, Inc.,* 127 S. Ct. 764, 769 (2007).

Although in *Lear* the patent's validity had not yet been finally determined, the Court held that "overriding federal policies would be significantly frustrated if licensees could be required to continue to pay royalties during the time they are challenging patent validity in the courts." *Id.* at 673. Such a requirement would provide the licensor with additional economic incentive to "devise every conceivable dilatory tactic" to postpone a final adjudication. *Id.* Also, the expense of prosecuting lengthy trial proceedings and defending an inevitable appeal could substantially deter licensees from attempting to prove patent invalidity in court. *Id.* at 673-74. If a licensee believes he will soon replace a patented idea with a new one, he will have little incentive to initiate court proceedings "unless he is freed from liability at least from the time he refuses to pay the contractual royalties." *Id.* at 674. Also, in *MedImmune*, the Court rejected the argument that a repudiating licensee, having alleged a contractual dispute, must comply with its contract and pay royalties "until its claim is vindicated in court." *MedImmune,* 127 S. Ct. at 769, 770-71.

Here, Apex/Telenational paid all royalties due under the License Agreement until this court's March 29, 2007 determination that the patents were invalid. Even assuming the court's order and judgment regarding the invalidity of the patents did not relieve Apex of further royalty payments under the License Agreement, Cygnus's Notice of Termination on March 2, 2007 operated to relieve Apex of its payment obligations past March 2007 under the License Agreement. As discussed above, Apex is not a party to the Consent Judgment and would not be barred by *res judicata* from challenging the validity of the patents.

Further, Cygnus fails to show that the July 21, 2002 License Agreement between Apex/Telenational and Cygnus extends to Rapid Link's past use of international call-back services. With the transfer in 2006, Canfield offered to pay Cygnus royalties going forward for the Rapid Link

ORDER DENYING PLAINTIFF'S MOTION FOR PAYMENT OF ROYALTIES- No. C-02-00144 RMW
AEL/MAG 14

portion of the international call-back business if Cygnus agreed to forgive past due royalties owed by Dial-Thru and Rapid Link from 1999 to 2006, but Cygnus declined the offer. Mot. at 4-5. Therefore, no evidence exists that the July 21, 2002 License Agreement extends to Rapid Link or that Rapid Link owes Cygnus royalties for its international call-back business. Rapid Link was not a party to the License Agreement between Apex and Cygnus, the License Agreement was not extended to include Rapid Link, and Cygnus has now provided notice to Apex that the License Agreement has apparently been terminated as a result of the acquisition of Telenational by Rapid Link.

### III. ORDER

For the foregoing reasons, Cygnus's motion for payment of royalties is denied without prejudice. The court further denies Cygnus's request to issue an order show cause regarding contempt, as Cygnus has not shown that Telenational, Apex, Canfield or Rapid Link is bound by the July 8, 2002 Consent Judgment.

DATED:  2/22/08

*Ronald M Whyte*
RONALD M. WHYTE
United States District Judge

ORDER DENYING PLAINTIFF'S MOTION FOR PAYMENT OF ROYALTIES- No. C-02-00144 RMW
AEL/MAG               15

**Notice of this document has been electronically sent to:**

**Counsel for Plaintiff:**

John P. Sutton                     johnpsutton@earthlink.net

**Counsel for Defendants:**

Robert L. Esensten              resensten@wcclaw.com

Counsel are responsible for distributing copies of this document to co-counsel that have not registered for e-filing under the court's CM/ECF program.

**Dated:**   2/22/08                                      /s/ MAG
                                                                  **Chambers of Judge Whyte**